**In re PHOENIX STEEL CORPORA-TION, Debtor.**

**Misc. No. 84–23 MMS.**

United States District Court,
D. Delaware.

March 12, 1984.

Marc Abrams, Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Herbert Stephen Edelman, and Richard J. Miller, Levin, Weintraub & Crames, New York City, Wilson M. Brown, Esq., Drinker, Biddle & Reath, Philadelphia, Pa., of counsel), for Phoenix Steel Corp.

Lawrence C. Ashby, Ashby, McKelvie & Geddes, Wilmington, Del. (Edna Rubin Sussman, Allan L. Gropper, and Richard B. Sypher, White & Case, New York City, David W. O'Brien, and Jami Wintz McKeon, Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel), for French American Banking Corp., Banque de L'Indochine et du Suez, Credit Industrial et Commercial, Banque Francaise de Commerce Exterieur and Credit Lyonnais.

David B. Stratton, Potter, Anderson & Corroon, Wilmington, Del., Barbara G. Kaplan, Stroock, Stroock & Lavan, New York City, of counsel), for Creditors' Committee.

Martin I. Lubaroff, Esq., Richards, Layton & Finger, Wilmington, Del., for State of Del.

Charles Gruver, Bayard, Brill & Handelman, Wilmington, Del. (Bonnie Fatell, Wexler, Weisman, Forman & Shapiro, Philadelphia, Pa., of counsel), for BA Commercial Corp.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Phoenix Steel Corporation ("Phoenix"), operating under the protection of Chapter 11 of the Bankruptcy Code, is faced with a critical cash flow crunch. Phoenix has filed an application [1] under the super priority provision of the Bankruptcy Code, 11 U.S.C. § 364(d)(1),[2] to give a new lender, who proposes to advance $3 million, a first security interest in existing and future inventory [3] and, *inter alia*, a junior lien and security interest in existing and future accounts receivable. At present four French banks (the "French banks"), who are owed $26 million in principal, hold a first security interest in inventory and a second position in accounts receivable.[4] If Phoenix's petition were granted, the inventory lenders' first lien and security position in the inventory would be subordinated to the new lender. In addition, the French banks would be relegated to a third lien and security position in the accounts receivable. The French banks oppose the proposed additional financing because, they argue, their secured status in collateral would not

---

1. This application was withdrawn from the Bankruptcy Court and assigned to this Court, sitting as a United States District Court, because of the temporary unavailability of the Bankruptcy Judge.

2. 11 U.S.C. § 364(d) provides:

 (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
 (A) the trustee is unable to obtain such credit otherwise; and
 (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

 (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

3. Inventory includes raw materials, work in process, finished goods and manufacturing supplies.

4. Phoenix has credit arrangements with five French banks aggregating $30 million: Credit Lyonnais ($8 million), French American Banking Corporation ($10 million), Credit Industrial et Commercial ($5 million), Banque Francaise de Commerce Exterieur ("BFCE") ($4 million), and Banque de L'Indochine et du Suez ($3 million). BFCE has lost its security interest by reason of its failure to file continuation statements. The total secured principal of the remaining four French banks is $26 million.

be "adequately protected" as required by § 364(d)(1)(B).

Some background facts are essential to understanding the resolution of Phoenix's application for additional financing. By early 1983, Phoenix was in need of working capital notwithstanding its previous $30 million loan from the French banks. It consequently entered into a financing arrangement with Bank of America Commercial Corporation ("BACC"). That agreement provided that BACC would make advances to Phoenix on a "borrowing base" which was defined in the agreement as "an amount equal to the lesser of $20 million in the aggregate or up to 90% of the net value due on Acceptable Receivables assigned to the Secured Party."[5] The BACC financing was secured by all of Phoenix's accounts receivable.

On August 12, 1983, Phoenix filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On August 18, 1983, the Bankruptcy Court entered an order entitled "Order Approving Debtor In Possession Financing and Granting Liens and Administrative Expense Priority Pursuant to 11 U.S.C. §§ 364(c) and (d)(1)" (the "Financing Order"). The Financing Order continued Phoenix's accounts receivable credit line by approving the Loan and Security Agreements with BACC. As security for advances from BACC during the Chapter 11 proceeding and for advances previously made, the Financing Order au-

thorized Phoenix to grant, effective August 12, 1983, a first lien and security interest in all existing and future accounts receivable and a security interest and lien in, *inter alia*, all other property of Phoenix subject to valid and perfected liens including a lien on inventory subject to valid and perfected liens and security interests of the French banks.[6]

By consent order dated September 1, 1983, in an effort to provide "adequate protection" to the French banks as contemplated by Sections 361 and 364(d) of the Code, the Bankruptcy Court granted the French banks the following security interests as of August 13, 1983: 1) a second lien and security interest in existing and future accounts receivable subject to the lien and security interest of BACC, 2) a first lien and security interest in all existing and future inventory, 3) a second lien and security interest in proceeds of all existing and future inventory, and 4) a security interest, lien and mortgage in the physical assets of Phoenix subject to all secured liens and to be shared equally with BACC.[7]

Thus, while there are variances and additions between pre and immediate post-petition security positions, the fundamental security positions of all creditors remained the same. With respect to accounts receivable, BACC has a first lien security position and the French banks have a second position. Conversely, the French banks have a first lien security position in inven-

---

**5.** For an account to be "acceptable" or "eligible" for inclusion in the borrowing base, within the meaning of the loan agreement, the account must not be due over 120 days from the invoice date and must be protected by a specified amount of insurance from the American Credit Insurance Corporation. Eligibility, as defined, does not necessarily reflect on the collateral value or collectibility of the account.

**6.** In addition, the Financing Order deemed all advances made by BACC to constitute a cost and expense of administration pursuant to Section 364(c)(1) of the Code having priority over all other costs and expenses of administration of the kinds specified in Sections 503(b), 507(a) or 507(b) of the Code. The pre-petition collateral in which BACC had a lien and security interest was deemed to continue to secure all pre-petition debt, as well as to constitute security for

any indebtedness of Phoenix to BACC based upon advances made by BACC under the Financing Order.

**7.** The September 1, 1983, order also provided for Minimum Book Values of inventory to provide adequate protection for the French banks as follows:

D. The Minimum Book Values of the inventory shall be not less than 95% of the valuation levels set forth below:

| | | [95%] |
|---|---|---|
| Raw material, work in process and finished goods | $15,100,000 | [$14,345,000] |
| Manufacturing supplies | 15,400,000 | [$14,630,000] |
| TOTAL | $30,500,000 | [$28,975,000] |

Numerous reporting, inspection and curative provisions were also incorporated in the September 1, 1983, consent order.

tory while BACC now has a second position. If Phoenix's application were granted, the French banks' first lien position on inventory would be subordinated to the new lender in principal amount of $3 million and their second lien on accounts receivable would slip to third position.

The prognosis for Phoenix's future, without additional financing, appears bleak. Despite effecting labor economies, Phoenix has been unable to achieve a neutral, much less positive, cash flow during its operation under Chapter 11. For the period September, 1983, through the end of January, 1984, there was a negative cash flow of approximately $4 million. (Testimony of L.A. Fort, Tr. at 333). An additional negative cash flow of an approximate $750,000 was estimated to have occurred in February.[8] The problem is so serious that without an infusion of cash Phoenix will run out of funds no later than March 19, necessitating a shut down of its steel plants in Claymont, Delaware, and Phoenixville, Pennsylvania. This imposing negative cash flow problem undoubtedly compels Phoenix to seek court authority to borrow funds.

Given the effort and length of time Phoenix has spent searching for funds, it is clear that the money lending market views Phoenix as not having any assets which it can pledge to freshly collateralize a loan. In short, Phoenix is leveraged out. It can only obtain a cash infusion by obtaining a court order subordinating the lien and security interest of the French banks to the new lender.

Against this background Phoenix now applies for additional financing.

Phoenix presently has two commitments, only one of which it can ultimately use. One commitment is for a $3 million cash infusion and the other is for $1 million in trade supplier credit and $2 million cash. Both commitments contain the same collat-

eral requirement which would necessitate subordinating the four French banks' security interest in collateral by $3 million. For convenience, no distinction will be made between the commitments and they will be referred to as a lender's advance of $3 million.

█ Since the four French banks now have a first lien and security interest in inventory and a second position in the accounts receivable, they argue that they would lose the "adequate protection" to which they are entitled under 11 U.S.C. § 364(d)(1)(B) if their present lien position is subordinated by $3 million to the new lender. Under section 364(d)(2) Phoenix has the burden of proof on the issue of adequate protection.[9]

Phoenix urges it has satisfied its burden in two ways: 1) it has met its burden by demonstrating that the French banks enjoy an ample equity cushion in secured assets so that subordination of their security position by $3 million would not be deleterious, and 2) it has offered new security to the four French banks equal in value to the $3 million sought to be subordinated.

**Equity Cushion**

Any equity cushion would necessarily depend on valuation of Phoenix's inventory, accounts receivable and physical assets. Employing going concern value, Phoenix has presented testimony that the value of inventory at cost for the week ending February 25, 1984, was $25,626,760 composed of $1,331,800 Raw Materials, $3,791,730 Works in Process, $7,190,080 Finished Goods and $13,313,50 in Manufacturing Supplies. (I.L. Ex. 38). Phoenix also urges that inventory would be enhanced by approximately $1.5 million from the $3 million proceeds of the loan for which it seeks court approval. Thus, according to Phoenix, the value of existing inventory com-

---

**8.** From the filing of the petition to January 31, 1984, Phoenix lost $6.2 million stated in terms of profit and loss. (Testimony of L.A. Fort, Tr. at 266). Phoenix estimates that a $1,353,500 loss occurred in February. (*Id.* at 282).

**9.** Phoenix also has the burden of showing it "is unable to obtain such credit otherwise." It has met this burden and indeed, the French banks do not contest that financing is not otherwise available.

bined with inventory to be purchased as a result of the loan is approximately $27.1 million.

Phoenix asserts that the French banks are secured by other collateral which should go into the "adequate protection" analysis. They point to testimony that the collateral value of accounts receivable in excess of that necessary to repay BACC for its outstanding advances is $5 million. Phoenix also points to the security position granted to the French banks in all other assets of Phoenix. On a going concern basis, Phoenix values its fixed assets at approximately $70 million, with outstanding security interests in the amount of $32 million. This leaves the French banks, Phoenix asserts, with a second security interest shared with BACC in fixed asset collateral of approximately $38 million.

Aggregating its value of inventory, the proposed addition to inventory, the balance of accounts receivable and the fixed asset base net of debt, Phoenix urges that the French banks' $26 million debt is secured by collateral (net of debt) having a going concern value of $70 million. From this, Phoenix urges that the French banks retain a more than adequate equity cushion and are therefore adequately protected within the meaning of section 364(d)(1).

The French banks vigorously protest Phoenix's position. They urge that their security position was already precarious at the time Phoenix filed its petition. Negotiation at that time lead to the creation of minimal safeguards, including minimal inventory levels, so that the French banks would be adequately protected after permitting their pre-petition inventory collater-

al to be converted to accounts receivable and subjected to the senior security interest of BACC. They have witnessed, the French banks contend, a steady erosion in the value of their inventory collateral. That erosion, stated in terms of book value, is set forth in tabular form [10] as follows:

PHOENIX STEEL CORPORATION

LEVEL OF INVENTORIES

| | August 11, 1983 | January 31, 1984 | February 25, 1984 |
| --- | --- | --- | --- |
| Raw Materials | $ 1,306,715 | $ 1,504,312 | $ 1,331,800 |
| Work-in-Process | 7,804,295 | 5,046,662 | 3,791,730 |
| Finished Goods | 8,166,974 | 5,944,919 | 7,190,080 |
| Manufacturing Supplies | 15,353,912 | 13,226,771 | 13,313,150 |
| Total Inventory | $32,667,896 | $25,772,664 | $25,626,750 |

$3.1 million of the loss in value of inventory is attributable to an accounting write-down. Adjusting for the write-down, the inventory as of the date of filing was approximately $29.5 million. On February 25, 1984, the inventory was about $25.6 million. Thus, from date of filing the Chapter 11 petition to February 25, 1984, there was a true $3.9 million inventory erosion.[11]

The French banks most bitter attack is aimed at Phoenix's use of "going concern" value as the standard of valuation to determine whether the banks are adequately protected. The banks assert liquidation value should be employed.

■ Neither section 364(d) of the Code nor section 361 [12] delineate the standard of

---

**10.** I.L. Ex. 43 (footnotes omitted).

**11.** As further indication of the erosion of their position, the French banks point to post-petition interest accruals of approximately $1.8 million to February, 1984, which will grow to an estimated $4.4 million by December 31, 1984. In support of their claim of right to post-petition interest, the French banks correctly point to 11 U.S.C. § 506(d) which provides for post-petition interest to the extent the claim is secured. The French banks argue that, to the extent their lien position is subordinated, they will effectively have lost their statutory right to post-petition

interest. As will be seen *infra,* the issue of whether post-petition interest is entitled to § 364(d) adequate protection is not reached. *See generally* N. O'Toole, *Adequate Protection and Postpetition Interest in Chapter 11 Proceedings,* 56 Am.Bankr.L.J. 251 (1982).

**12.** 11 U.S.C. § 361 provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent

valuation by which adequate protection should be determined. An equity cushion has, however, been held to constitute adequate protection. *See In re Stanley Hotel, Inc.*, 15 B.R. 660 (D.Colo.1981); *In re Llewellyn*, 27 B.R. 481 (Bkrtcy.M.D.Pa.1983); *In re Stratbucker*, 4 B.R. 251 (Bkrtcy.D. Neb.1980); *cf. In re High Sky, Inc.*, 15 B.R. 332 (Bkrtcy.M.D.Pa.1981). It is clear that if a sufficient equity cushion exists, as Phoenix urges, the French banks' security would not be impaired and they would be adequately protected.

Since an equity cushion may be a basis for finding the existence of adequate protection, the Court's inquiry necessarily focuses on the valuation of the French banks' collateral. The legislative history makes clear that the Code's silence as to the standard of valuation of collateral for adequate purposes was deliberate:

> The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development....
>
> Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.
>
> In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 54 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840. The reported

cases have employed standards of valuation for adequate protection ranging from going concern or fair market value, *see In re Automatic Voting Machines Corp.*, 26 B.R. 970 (Bkrtcy.W.D.N.Y.1983); *In re QPL Components, Inc.*, 20 B.R. 342 (Bkrtcy.E.D.N.Y.1982); *In re Shockley Forest Industries, Inc.*, 5 B.R. 160 (Bkrtcy. N.D.Ga.1980); *In re Rogers Development Corp.*, 2 B.R. 679 (Bkrtcy.E.D.Va.1980), to liquidation value, *In re Ram Manufacturing, Inc.*, 32 B.R. 969 (Bkrtcy.E.D.Pa.1983); *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707 (Bkrtcy.E.D.N.C.1983); *cf. In re Day Resource & Development Co.*, 21 B.R. 176 (Bkrtcy.D.Idaho 1982), and values in the continuum between these two standards, including a value between appraisal figures. *In re Bouquet Investments*, 32 B.R. 988 (Bkrtcy.C.D.Cal.1983); *In re High Sky, Inc.*, 15 B.R. 332 (Bkrtcy.M.D.Pa.1981).

Valuation in a given case depends on that calculation which properly reflects a secured creditor's true state of protection. The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain:

> The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. *Secured creditors should not be deprived of the benefit of their bargain.* There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, *the purpose of the section is to insure that the se-*

that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

# 225

*cured creditor receives in value essentially what he bargained for.*

H.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6295 (emphasis added).

 Essential to the valuation of collateral is a judgment as to how long Phoenix will continue to operate. This determination, in turn, requires a brief discussion of the history of the steel industry and Phoenix's past performance. In general, the steel industry is capital intensive and highly cyclical. Economic forecasting is both difficult and hazardous. Phoenix, important to the economy locally with its 1150 employees, accounts for ½ of 1% of all domestic steel industry shipments. (I.L. Ex. 13, § IV at 11). It has two principal divisions—the Phoenixville division, which produces seamless pipe and tube and the Claymont division, which principally produces carbon plate. (*Id.*, § IV, at 1).

The Phoenixville division has historically operated at a profit. However, the decline in oil and gas exploration and the past weakness in the U.S. economy have taken their toll. In 1982, the Phoenixville division operated at only 40% of capacity. At the same time a less profitable product mix has operated to reduce its profit margin. During the same year it also suffered an unexpected weakness in the market, resulting in a reduction in tonnage sold and price, and causing an 82.5% decrease in net operating income. (*Id.* at 13, 14). In 1983 it suffered its first operating loss since 1976. It permanently closed its open hearth furnace in 1983 and has taken an appropriate write-down in inventory.

The Claymont division, the larger of the two divisions, presents a far bleaker picture. During the five years from 1978–1982 the Claymont division showed operating losses before interest expense in three different years (1978, 1981, 1982) totalling $16.9 million. Almost half of those losses occurred in 1982. During its two years of operating income profitability (1979, 1980) it showed only $3.3 million operating income before interest expense. (I.L. Ex. 13, § IV at 5). For the Claymont division to become cost competitive it requires capital expenditures of $17.6 million and an additional $5.5 million for postponed heavy maintenance. (*Id.*, § 6 at 13–14).

Stated in terms of profit and loss, and aggregating the results of the Phoenixville and Claymont divisions, the debtor lost $17.6 million in 1982 (I.L. Ex. 20, Ex. B–3) and $23.3 million in 1983 (I.L. Ex. 46), with a projected loss of $2.7 million for the first two months of 1984. (I.L. Ex. 47). Despite increased labor and other economies since filing its Chapter 11 petition, debtor has lost over $6 million through January, 1984. On a cash flow basis it has lost over $4 million since filing its petition.

The above dismal historical financial picture has had many consequences, two of which are immediately germane to the Court's valuation standard. First, no lender has been willing to loan funds to a leveraged out Phoenix unless granted super priority status under 11 U.S.C. § 364(d). Second, testimony indicates that Phoenix will run out of cash, forcing it to close its doors, on or about March 19 unless a cash infusion begins prior to that date.

Phoenix insists that a recent turn around in the market together with its intermediate term business strategy dictate that the French banks will not be harmed by subordinating their liens. Based on volume and price of "bookings" during the first twenty days of February, Phoenix now has a two-month backlog of orders that assures it will have a neutral or positive cash flow in April provided it receives the necessary cash infusion. The French banks have not contested that short term prediction based on the Phoenix bookings.

Debtor predicts that the February bookings mark the beginning of the long awaited resurgence in the capital goods economy, particularly as it affects the steel industry. Assuming no increase in rate or price of bookings over February's, Phoenix asserts it could begin repayment of the $3 million by July 30 and have the loan completely paid off by the end of 1984.

Phoenix recognizes that it cannot successfully reorganize from internally generated profits. It is too highly leveraged and its capital needs too substantial for the company to become and remain competitive. Its weak financial position combined with the historically demonstrated volatile and cyclical nature of the steel business mandate the need for a long term cash infusion. To that end, well before the perceived market turn around, Phoenix in December formally retained an investment banker, Wm Sword & Co. ("Sword"), to find additional long term equity cash resources. The additional equity cash resources would presumably be accomplished through a business combination such as a merger, or sale of stock, or at least would be structured to take advantage of an $85 million tax loss. Alternatively, Phoenix seeks a sale of assets to one or more buyers which would hopefully keep both plants operating. Thus, from a longer range point of view, the purpose of a $3 million cash infusion with the accompanying subordination of the French banks' interest in collateral is to buy time to find a buyer for the business or its assets. Sword estimates that Phoenix needs sixty to ninety days from the date of its Information Memorandum (I.L. Ex. 13) to solicit interested parties and an additional six months or to the end of the 1984 calendar year to negotiate and close the transaction. As of the time of the hearing on debtor's application, March 6–8, Sword attracted some preliminary inquiries, but no solid prospects.

The French banks, not sharing Phoenix's optimism or enthusiasm, decline to willingly subordinate what they regard as an already undersecured collateral position. A portion of the hearing and exhibits were devoted to disparaging Phoenix's projections. Phoenix's projections historically have been wide of the mark, but apparently the process of economic forecasting for volume, product mix and price in the steel industry is so hazardous that most of the industry was also plagued by equally abysmal projections.

At issue is whether either of two critical projections will be realized. The first projection is whether Phoenix's February bookings represent the beginning of an upturn in the capital goods economy, which will be sustained for a sufficient length of time to pay off the $3 million loan and/or gather in long term cash resources. Phoenix urges the increase in bookings is not temporary and will sustain the company long enough to buy the time it needs. Otherwise, says Phoenix, at a time when it has back orders and a strategy for long term viability, it will have to close its doors, causing the lay off of 1150 employees, making impossible repayment of any portion of $46 million in unsecured claims, irrevocably wiping out 9000 shareholders and possibly imperiling repayment of some of the existing secured indebtedness. The French banks, having already suffered an inventory erosion, insist that they should not bear a $3 million risk merely because February bookings are favorable. They point to the volatile and cyclical nature of the steel industry and to Phoenix's past poor earnings performance.

The second projection is that a buyer will be timely found. At present an investment banker is looking for a buyer. Whether one will be found, within what time frame, and on what terms, is unknown.

■ Given the possibility that a sustained market turn around has occurred and the probability that Phoenix could pay off the $3 million loan if the February bookings were sustained over an approximate nine-month period or a buyer timely found, liquidation value should not be used in making the adequate protection determination. However, recognizing that the French banks' collateral would be imperiled by $3 million if neither occurred, it would be inappropriate to use going concern or fair market value. The court therefore will value the French banks' collateral at an interim level. Given the speculative projections entangling this case, it is impossible to obtain precision in valuation. For the purposes of this opinion, the Court will value the French banks' collateral at the

mean of liquidation value and going concern value.

The Court will now proceed to apply the above standard where applicable to the French banks' collateral.

## I. Valuation of Inventory

A primary component of the French banks' collateral is their first lien on inventory. The debtor and the French banks submitted divergent valuations of Phoenix's inventory on a "going concern" basis as well as a liquidation basis. The alternative positions are detailed below.

### A. Liquidation Values

The parties' respective liquidation valuations are not far apart.

#### 1. Phoenix's Values

According to figures prepared by Phoenix's Treasurer and Chief Financial Officer, L.A. Fort, as of December 31, 1983, Phoenix's inventory had a value at liquidation of $10.9 million.[13] (I.L. Ex. 3 at 3). Not included in Mr. Fort's figures for liquidation value but included in Mr. Fort's testimony at the hearing, is Phoenix's predicted increase in the value of inventory flowing from the infusion of $3 million in new capital. Phoenix estimated a $1.5 million increase in *book value* of inventory flowing from this $3 million capital influx. Mr. Fort testified at first that the inventory acquired through use of the new cash infusion would receive 100 cents to the dollar upon liquidation. (Testimony of L.A. Fort, Tr. at 174–75). On cross-examination, however, Mr. Fort conceded that liquidation might bring less than book value for the

new inventory. (*Id.* at 224–34). Fort did not assign a number to this reduction in value. The French bank's expert, Mr. Dean Goldnetz,[14] devised what the Court believes is an appropriate method for calculating that decrease: The $1.5 million rise in book value is reduced by 35%—the approximate percentage reduction in book value that Phoenix's figures reflect for raw materials, work-in-process and finished goods.[15] Thus the $3 million capital influx would yield a $1 million rise in liquidation value, yielding a total liquidation value for inventory of $11.9 million.

#### 2. French Banks' Values

The French banks offered into evidence a range of liquidation values from $10.1 million to $11.1 million (I.L. Ex. 49). The French banks arrive at a base figure of $10.1 million by taking Phoenix's $10.9 million December 31, 1983, liquidation value and deducting seven percent to reflect a January decrease in book value indicated in Phoenix's financial statements. (Testimony of A. Goldnetz, Tr. at 521–22). The lower end of the range of the French banks liquidation values uses the base figure of $10.1 million and assumes that the $3 million cash infusion will have no effect on the liquidation value of inventory. The higher end of the range of values assumes that the book value of inventory will increase by $1.5 million and that, applying a 35% reduction, the liquidation value will rise by $.975 million.

#### 3. Court's Valuation

The Court agrees with the French banks that Phoenix's valuation must be reduced

**13.** *Cf.* Mr. Fort's testimony roughly estimating the liquidation value of Phoenix's inventory at approximately $11.5 million. (Testimony of L.A. Fort, Tr. at 173).

**14.** Mr. Goldnetz is a former Director of Financial Analysis for all steel and raw materials products operations for United States Steel Corporation and former Chief Financial Officer for United States Steel's Eastern Steel Division.

**15.** Phoenix's figures for December 31, 1983, showed an aggregate book value for raw materi-

als, work-in-process, and finished goods of $15.2 million. Mr. Fort's liquidation value for these components of inventory was $9.4 million, reflecting a 38% reduction in value.

Mr. Goldnetz generously assumed that none of the $1.5 million increase in book value would reflect purchases of manufacturing supplies. Manufacturing supplies would have been subject to a 90% reduction from book value upon liquidation according to Mr. Fort's calculations. (*See* I.L. Ex. 3).

by seven percent to reflect a decrease in inventory value since December 31, 1983. Thus, the Court will apply a base figure of $10.1 million. The Court also agrees with the French banks that a $3 million cash infusion will result in a rise in the book value of inventory of somewhere between zero and $1.5 million. The mean value of $750,000, the Court believes, would be the most appropriate figure to use. That $750,000 book value figure must then be reduced by an appropriate percentage to arrive at a liquidation value. The Court accepts as reasonable Mr. Goldnetz's methodology, and therefore will reduce the $750,000 book value by 35 percent, yielding a number of roughly $.5 million. Adding $.5 million to the $10.1 million base, the Court arrives at a figure of $10.6 million. This number will be used hereafter as the liquidation valuation of Phoenix's inventory.

### B. Going Concern Values

Phoenix and the French banks arrive at vastly different values for inventory when measured as part of a going concern.

### 1. Phoenix's Values

Phoenix argues that book value is the proper measure of inventory of a going concern. Phoenix's latest figures, for February 25, 1984, reflect a book value of $25.6 million.[16] Phoenix also contends that its book value for inventory will rise by $1.5 million if Phoenix receives its hoped for $3 million loan. This would bring Phoenix's book value to a figure of $27.1 million.[17]

### 2. French Banks' Values

The French banks argue that book value is irrelevant to the collateral value of inventory. Fair market value, they explain, yields the only appropriate figures for measuring the going concern value of Phoenix's inventory.

Mr. Goldnetz prepared an exhibit entitled "Value to Inventory Lenders of Their Collateral Based on Fair Market Value if a Purchaser of the Business as a Going Concern is Found." (I.L. Ex. 49). He divided the inventory portion of the French bank's collateral into three parts: 1) raw materials and steel; 2) supplies; and 3) probable increase in inventory from proceeds of the $3 million cash infusion. Mr. Goldnetz developed a range in going concern values for each of the three subparts: $10.0 to $11.8 million for raw materials and steel, $3.1 to $4.7 million for supplies, and zero to $1.5 million for the increase resulting from a cash infusion. Mr. Goldnetz's reasoning was as follows.

### A. Raw Materials and Steel

Starting with Phoenix's January book values for raw material and steel of $12.5 million, Goldnetz applied a range of hypothetical small percentage reductions to arrive at the prices that a hypothetical willing buyer would pay for this portion of Phoenix's inventory. Although Goldnetz agreed with Mr. Fort that raw materials and steel would sell at something close to book value, Goldnetz explained that consideration must be given to the probability that a buyer would not consider all of Phoenix's inventory "prime product." (Testimony of D. Goldnetz, Tr. at 532–33). This probability would result in at least a five to ten percent reduction from book value according to Goldnetz.[18] In addition to a reduction based on quality, Goldnetz explained that book value should be reduced by about 10% for the possibility that a buyer might desire to run only a portion

---

16. I.L. Ex. 38, Phoenix Steel Corporation Weekly Inventory Report, week ending February 25, 1984.

17. Mr. Fort, in preparing Phoenix's exhibits and in testifying for Phoenix, used Phoenix's January 31, 1984, book value of $25.8 million rather than the more recent February 25 book value of $25.6 million. (*See* I.L. Ex. 3). The Court will use the more up-to-date figures reported in its February 25 weekly report.

18. Goldnetz based his 5–10% figure on his personal examination of Phoenix's inventory as well as his knowledge of the steel industry and Phoenix's particular history. (Testimony of D. Goldnetz, Tr. at 533–34).

of one of Phoenix's steel plants. A possible scenario, Goldnetz explained, is that a buyer with its own source of semi-finished products might not want to continue the Claymont plant's ingot production operation. (*Id.* at 535).

By reducing the $12.5 million book value by a minimal 5%, Goldnetz arrived at his high figure of $11.8 million. By reducing the book value by a full 20%, Goldnetz arrived at his low figure of $10.0 million.

## B. Supplies

Goldnetz applied a much larger percentage reduction to Phoenix's January 31 book value of $13.3 million for supplies. Many supplies are single purpose, many have deteriorated, and many have been reprocessed, Goldnetz explained. (*Id.* at 538–40).[19] Goldnetz created two hypothetical buyers in preparing his low and high fair market valuations. A "choosey" buyer, Goldnetz assumed, would elect to buy one-third of Phoenix's supplies inventory at 50% book value; a more liberal purchaser would buy half of the supplies inventory at 60% of book value. In the case of the choosey buyer, Goldnetz reduced the book value of one-third of the supplies inventory by 50%, and reduced the remaining two-thirds by 90% (using Phoenix's assumption that supplies bring only 10% of book value at liquidation). This number came to $3.1 million. In the liberal buyer's case, Goldnetz reduced the book value of one-half of the supplies inventory by 40% and reduced the remaining half by 90%, yielding a $4.7 million fair market figure.

## C. Probable Increase in Inventory from Proceeds of Loan

Goldnetz accepted Phoenix's $1.5 million figure as the upper range of the possible increase in book value of inventory resulting from a $3 million capital infusion. The lower end of Goldnetz's scale is a zero increase. With this aspect of inventory, Goldnetz agreed with Phoenix that book

value fairly reflects going concern value. Any inventory purchased with proceeds of a new loan, Goldnetz explained, would be the "newest, freshest" inventory, and consequently worth close to book value. (*Id.* at 542). Goldnetz, therefore, did not reduce Phoenix's $1.5 million figure when calculating his high fair market value figure.

## 3. Court's Valuation

The Court agrees with the French banks that for purposes of a going concern analysis fair market value is the proper measure of Phoenix's inventory. Particularly in this case, where Phoenix officials admit that the company cannot survive without a purchaser, and where the company's admitted game plan is to try to survive until a purchaser can be located, fair market value of Phoenix's inventory, as reflected by the price that a willing purchaser would pay for that inventory, is the only suitable measure of the inventory's value as collateral to the French banks.

Mr. Goldnetz's valuation provides the only fair market value numbers in the record. The Court finds his methodology accurate and acceptable. Adding the Goldnetz figures together, the fair market value of Phoenix's inventory ranges from $13.1 to $18.0 million. It is reasonable to assume that the true fair market value falls somewhere between the two extremes. For purposes of calculating adequate protection the Court will accept as the fair market value of Phoenix's inventory $15.6 million—the mean of Goldnetz's extremes.

## II. Valuation of Accounts Receivable

The second component of the French banks' collateral involves fluid "excess" accounts receivable. As previously noted, BACC, as security for making cash advances to Phoenix, was given a first position in all accounts receivable. Phoenix argues that there is a reserve of excess

---

**19.** Goldnetz based his evaluation on a study of Phoenix's detailed inventory reports as well as his personal tour of Phoenix's plants.

receivables not subject to BACC's lien which must be included in the total amount of collateral available to the inventory lenders. This pool, says Phoenix, consists of the difference between the total accounts receivable and the amount of cash advanced by BACC under the loan agreement. According to Phoenix, the total amount of its excess accounts, including eligible and ineligible accounts is $5.5 million. Using a 10% discount rate for uncollectible accounts, Phoenix contends that there is $5 million worth of collateral in excess accounts receivable.

The French banks concede some value in excess accounts but, understandably, suggest that a lower collateral value must be assigned. Since the borrowing base is completely diminished by mid-month, the French banks urge that the total excess accounts must be set somewhere around $2.5 million or half of what they believe is the maximum value of excess accounts. Moreover, the French banks contend that Phoenix's proposed 10% discount rate is far too low.[20]

Assigning a fair collateral value to excess accounts on this record is extremely difficult. According to Mr. Fort, the position of accounts receivable fluctuates throughout the month. The end of each month represents the peak period of borrowing capability: inventory has been shipped, thus increasing the total accounts receivable and expanding the borrowing base. By the middle of the month, however, as Phoenix replenishes its inventory, the available base of credit diminishes. As the record shows, on February 17, 1984, total excess accounts were $3.5 million (I.L. Ex. 3, p. 2); by February 29 the amount increased to a peak level of $5.5 million

(Testimony of L.A. Fort, Tr. at 148); and by March 7 the amount of excess receivables fell by some indeterminate amount.[21] Given these fluctuations, the Court cannot accept Phoenix's assigned value of $5.5 million to the excess accounts. That figure simply represents only the peak level of accounts during a month, and indeed, as Mr. Fort conceded, there is no certainty that such excess accounts would be available at any given point. (Testimony of L.A. Fort, Tr. at 208). In fact, by March 19, 1984, the company expects to have completely drawn down its line of credit from BACC.[22]

■ The Court believes that a reasonable approach to accounts receivable would be to determine the excess accounts at a point near the mid-part of a month. The only actual documentation of the collateral value of excess receivables for such point in time is found in a February 20, 1984, report prepared by Mr. Fort. (See I.L. Ex. 3). This document indicates that on February 17, 1984, total excess accounts were at $3.5 million with a discounted value of $2.8 million. Although the Court recognizes that accounts receivable would change with a $3 million cash infusion, the record does not indicate any estimate of or basis for estimating how such an infusion would affect total excess accounts. In addition, although both sides urge a discount rate at a level different from that used in the Fort analysis, neither party presented any systematic basis for applying a different rate. Given all the variables involved in accounts receivable, and the fact that the burden of proof is on Phoenix, the Court concludes that the $2.8 million used in the Fort analysis is a fair estimate of the collateral value

---

**20.** According to the French banks, upon liquidation the collectibility rate of accounts goes down for various reasons. No alternative rate, however, was offered.

**21.** Mr. Fort testified that on February 28, 1984, $3.2 million of the total $3.5 million in excess accounts was eligible. Ninety percent, or $2.7 million, of the eligible accounts is included in Phoenix's borrowing base. By March 7, 1984, the base fell to $2 million. There is no evidence

in the record, however, as to the total excess accounts for that day.

**22.** When the borrowing base is completely depleted, there nonetheless remains as collateral 10% of eligible accounts, accounts past due over 120 days, and accounts in excess of ACI insurance. There is no basis in the record, however, for calculating what these figures would be for mid-March.

of accounts receivable for both liquidation and going concern valuation.

## III. Valuation of Fixed Assets

### A. Phoenix's Values

The final source of collateral consists of fixed assets. Based on a study prepared by Equipment For Industry, Inc. ("EFI"), Phoenix assigns a $9.5 to $9.8 million liquidation value and a $70 million "going concern" value to its fixed assets. Because first liens on those assets total $32.3 million, only a going concern valuation would produce a source of excess collateral. However, an analysis of EFI's methodology used in deriving its $70 million figure compels the Court to reject EFI's valuation.

EFI's going concern valuation is based on its "value in place" analysis. As set forth in the report, value in place is

> the value of the assets in use as an integral part of an Operating Company for essentially the same purpose as it was originally intended, taking into consideration the age, state of art, condition and wear and attrition but not considering whether the yield of said Company justifies the investment of said Assets in the amounts resulting from the Appraisal.

(Debtor's Ex. 5 at 6). According to Arnold Landesburg, President of EFI, value in place is not the same as fair market value. (Testimony of A.L. Landesburg, Tr. at 409). As he defined the term, fair market value refers to a free market valuation of an asset for *off-site use,* based on the projected yield of the asset, where a willing buyer and seller are under no compulsion to buy or sell and where the sale occurs in excess of six months. (Debtor's Ex. 5 at 6). Mr. Landesburg made clear that his "going concern" value did not include a projection of the yield or rate of return on an investment in fixed assets for on-site use. Rather, EFI simply counted the "nuts and

bolts." [23] (Testimony of A.L. Landesburg, Tr. at 405).

### B. French Banks' Values

The French banks, in response, contend that the going concern value of fixed assets should reflect the amount a prospective buyer would invest in Phoenix. Any investor, say the French banks, would set a value for fixed assets in relation to the projected rate of return on the investment. According to the French banks, the fair market value of the fixed assets of Phoenix, as a going concern, is $15 to $20 million.

The value assigned by the French banks is based on a study prepared by Mr. Goldnetz. Employing a model he used at U.S. Steel, Mr. Goldnetz did not "appraise" fixed assets but examined fixed assets in relation to a reasonable projection of earnings, excluding taxes and interest. (Testimony of D. Goldnetz, Tr. at 550). Mr. Goldnetz believed that the typical investor in a steel facility would look for a 20 to 25% rate of return. (*Id.*). This projection was based on two factors. First, it was the range used by him at U.S. Steel when examining potential steel company acquisitions. Second, based on his expert judgment, a 15% return is the minimum rate that an investor would accept before making a permanent, long-term investment in any kind of business. (*Id.* at 551). Because of the risks involved and the characteristics of the steel business, an additional 5 to 10% rate of return would be expected: it is a capital intensive business; any investment is "fixed" because steel facilities are geared to particular products; steel is a low or no-growth business adversely affected by foreign competition; there is very little product differentiation; and the industry operates within a 6–8 year product line and price cycle (18 months of strong prices, 18 months of depressed prices, and a 4 to 5 year middle ground). (*Id.* at 551–554).

---

**23.** Although it is by no means clear, it appears that EFI's value in place is analogous to the replacement cost of an asset minus accumulated depreciation. *See* Testimony of A.L. Landesburg, Tr. at 406–7; Testimony of D. Goldnetz, Tr. at 608–9; Debtor's Ex. 5 at 13.

A potential purchaser of Phoenix, according to Mr. Goldnetz, would expect to invest a base amount of $50 million before giving any consideration to fixed assets. This base investment includes $23 million for identified capital expenditures,[24] $18 million for inventory, and $9 million in working capital ($7 million for net accounts receivable plus $2 million in cash to cover expenses as the business vacillates during and between each month). Using the $50 million base investment, Mr. Goldnetz calculated different levels of additional investment for fixed assets and then projected what average level of annual profits would be necessary to achieve a 20–25% return on the total investment in Phoenix. According to Mr. Goldnetz, the maximum investment a typical buyer would be willing to make is $65 million because, in his opinion, an investor could only expect to generate an average of $13 to $16.25 million in annual profits from Phoenix. Deducting the $50 million base investment, Mr. Goldnetz concluded that the fair market value of the fixed assets of Phoenix, as a going concern, is $15 million.

### C. Court's Valuation

■ The Court concludes that Mr. Goldnetz's approach results in a more accurate valuation of fixed assets than Phoenix's "value in place." EFI's value in place analysis is flawed because it omits the key variable motivating a prospective investor. As previously noted, EFI's value in place did not consider whether the yield of an asset would justify the level of investment specified in the report. The buyer of a fixed asset for on-site use, however, would indeed be concerned with the very factor excluded from EFI's report; namely, value

in relation to return on investment.[25] As conceded by Mr. Fort, the return generated by an asset determines its value. (Testimony of L.A. Fort, Tr. at 259). Particularly in this case, where according to the company's management Phoenix's raison d'être is to locate an acquirer of the corporation or its assets, fair market value as defined by Mr. Goldnetz is the only appropriate measure of Phoenix as a going concern.

Phoenix's attempt to discredit the Goldnetz study is not persuasive. Phoenix first attacks the projected levels of annual profit used by Mr. Goldnetz. Relying on the Information Memorandum prepared by Sword, Phoenix argues that over the course of the next three years, an average $20 million in net income could be expected after making certain capital improvements. Using that projection, Phoenix notes that, at a minimum, a $90 million total investment could be justified, leaving $40 million for Phoenix's fixed assets. The Court, however, concludes that the Sword projections do not accurately reflect the type of forecast that a potential purchaser would likely use. As noted by Mr. Goldnetz, the Sword figures must be tempered primarily because they are limited to a three-year up-swing period, whereas earnings must be projected for 6 to 8 years. (Testimony of D. Goldnetz, Tr. at 626). The projected $13 to $16.25 million average profit figures, which are needed to support Mr. Goldnetz's hypothetical $65 million investment, is a more reasonable performance estimate. Moreover, given the evidence adduced at the hearing, the Court must agree with Mr. Goldnetz that no reasonable investor would expect to generate more than $15 million in average profits from the Phoenix plant over a 6 to 8 year period.[26]

24. To arrive at this figure Mr. Goldnetz relied on the $21 million projection contained in the Sword report. He added, however, a conservative 10% for various contingencies, including inflation and capitalizing interest on assets during their period of construction. Mr. Goldnetz felt that the $23 million figure was still too low, but accepted it for his analysis.

25. Although both experts analyzed the value of assets on site, it is obvious that their approach

to valuation was radically different. The suggestion made by Phoenix, that the two opinions are equivalent in any way must, therefore, be rejected.

26. The $15 million average figure used by Mr. Goldnetz was based in part on Phoenix's past history. Even if, as suggested by Phoenix, a new investor would enjoy cost efficiencies not available to Phoenix, the Court would still conclude that the most reasonable projection for a

Phoenix also contends that some investors might accept a rate of return lower than the 20 to 25% used in the Goldnetz study and that other investors might be willing to pay more than $65 million.[27] Although Phoenix has posited various ways of financing an investment in the company as a basis for justifying a higher purchase price or a lower rate of return, the Court is not persuaded that these scenarios would affect a purchaser's investment expectations. Phoenix introduced no rebuttal evidence to establish a basis for calculating a different expected rate of return for a potential investor in the steel business. Moreover, even if there are attractive premiums lurking in the capital structure of Phoenix, such as $20.7 million of assumable debt at 5¾% interest rate, Phoenix has proffered no basis for quantifying their value.

The Court therefore concludes that the fair market value of Phoenix's fixed assets, as a going concern, is $15 million. Since there is $32.3 million in prior liens on the fixed assets, the liens exceed the fair market value of the fixed assets. As a consequence, the fixed assets have no collateral value to the French banks.

## IV. Total Value of Collateral

Adding together the Court's collateral values of $15.6 million in inventory, $2.8 million in excess accounts receivable and zero for fixed assets in excess of debt, the total value of the French banks' collateral comes to $18.4 million. Since the banks are owed $26 million, they have no equity cushion to absorb a $3 million subordination of their interests. The banks therefore would not be adequately protected within the

meaning of § 364(d) were the Court to approve Phoenix's financing application.

## V. New Collateral

Debtor urges that it is willing to provide fresh collateral to the four French banks. That collateral consists of the lien and security position formerly held by BFCE in inventory, accounts receivable and physical assets of Phoenix.

Phoenix asserts it is able to provide the fresh collateral by reason of the nature of the loan agreement among the French banks and the Bankruptcy Code. Under the terms of the inter-bank loan agreement, to which BFCE was a party, each bank is entitled to an interest in security in direct ratio to the amount advanced by each bank against the aggregate $30 million advanced by all the French banks. Since BFCE advanced $4 million, it previously had a 13.3% participatory interest in the collateral and its proceeds. However, as previously noted, BFCE lost its lien position because it failed to file continuation statements.

Debtor now contends that BFCE's interest in collateral belongs to it. Phoenix reasons that as a debtor in possession it has all of the powers of a trustee to avoid the pre-petition liens of BFCE under 11 U.S.C. § 544. It then urges that under section 551 of the Bankruptcy Code such liens are automatically preserved for the benefit of the estate.[28] It concludes the scenario by offering its right to this collateral to the remaining four French banks.

■ Ignoring the irony inherent in Phoenix's position, the Court will assume, without deciding, that Phoenix is able to provide fresh collateral equal to 13.3% of the value of the collateral presently held by the

---

six to eight year cycle is $13 to $16.25 million in profits. Indeed, to justify even a $70 million investment, over a 6 to 8 year cycle Phoenix would need to generate $28 million to $35 million for a peak 18-month period, $14 to $18 million in the middle five years, and would have to break even during the worst years. (*Id.* at 577).

27. Phoenix suggests that foreign steel concerns worried about protectionist legislation, businesses attempting to diversify and steel compa-

nies engaged in a program of rationalization are all examples of potential investors which would not require a 20 to 25% rate of return.

28. The Court notes that if Phoenix's new collateral argument were correct, the Court's previous determination that the value of the French banks' collateral is $18.4 million would be too high. The French banks' collateral would be worth only $15.9 million, leaving the banks even less protected than earlier determined.

French banks. In previously finding that there was no equity cushion, the four French banks were treated as being entitled to 100% instead of 87% of the collateral. The aggregate of the entire collateral was valued at $18.1 million. Taking 13.3% of $18.4 million yields $2.45 million. Since the proffered fresh collateral is identical in composition but less in value than three million, it cannot be the indubitable equivalent of the four French banks' interest in the collateral within the meaning of section 361(3). The offer of fresh collateral, therefore, does not furnish adequate protection to the four French banks within the meaning of section 364(d).

**Conclusion**

 There being no equity cushion or offer of substitute collateral in sufficient amount, the Court holds that the four French banks would not be adequately protected within the meaning of section 364(d) of the Code. An order will be entered denying debtor's application for additional financing.