**In re BEKER INDUSTRIES CORP., and Beker Phosphate Corporation, Debtors.**

**Bankruptcy No. 85 B 11709–11710.**

United States Bankruptcy Court, S.D. New York.

March 4, 1986.

Kronish, Lieb, Weiner & Hellman by William J. Rochelle, III, Richard Lieb, Karen M. Klein, New York City, for debtors-in-possession.

Rosenman Colin Freund Lewis & Cohen by Joel W. Sternman, Arthur S. Linker, Paul L. Bindler, Linda R. Brower, New York City, for the Official Committee of Debentureholders.

Weil, Gotshal & Manges by Marvin E. Jacob, Ellen Werther, Edward A.C. Sutherland, New York City, for Commercial Credit Business Loans, Inc. and Nat. Bank of Canada.

Whitman & Ransom by Richard Tilton, New York City, for Cargill, Inc.

Wachtel, Lipton, Rosen & Katz by Chaim J. Fortgang, Scott K. Charles, New York City, for The First Nat. Bank of Boston.

Bishop, Liberman & Cook by David A. Strumwasser, James M. Nolan, New York City, for Jessup & Lamont Capital Corp.

Breed, Abbott & Morgan by C. MacNeil Mitchell, New York City, for Marine Midland Bank, N.A. as indenture trustee.

Stroock & Stroock & Lavan by Lawrence Handelsman, Bonnie Schindel, New York City, for the Official Committee of Unsecured Creditors.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Beker Industries Corp. and Beker Phosphate Corporation (collectively "Beker" or the "Debtors") seek the approval of this Court pursuant to § 364(d) of the Bankruptcy Code, 11 U.S.C. § 364(d) (1984) (the "Code"), to enter into a proposed loan agreement ("Proposed Agreement") with four lenders. Three of the lenders provided secured loans to Beker pre-petition, are parties to a post-petition lending agreement with Beker, and have unequivocally affirmed on the record their commitment to lend pursuant to the Proposed Agreement. The Proposed Agreement principally provides for additional financing up to $14 million over a formula lending base of 85% of eligible accounts receivable and 50% of inventory, with a cap of $36 million. Super priority status is to be afforded to the debt. Security for repayment of the loan and for repayment of the loans made by the three pre-petition lenders is to consist of all prior collateral, a lien on the assets of Beker Phosphate second to a lien previously granted to Cargill, Inc., and a $10 million first lien on the Conda plant and Beker's partnership in a mine at Conda, Idaho.

The Official Committee of Debentureholders (the "Committee") opposes the motion on essentially three grounds. It asserts that, as holders of a first lien on the Conda plant and partnership interests, the Debentureholders are not adequately protected and that the Debtors have not shown that the financing was not otherwise

available. It also asserts that the Proposed Agreement would impermissibly permit ·cross-collateralization of the Debtors' pre-petition loan with post-petition assets. Hearings were held on January 30 and 31 and February 3, 4, 5, 6, 7, 21, 24, 26 and 27, 1986.

## I.

Beker manufactures and sells phosphate fertilizer products. Derivative of the economic troubles plaguing this country's farms, the Debtors filed petitions on October 21, 1985 seeking reorganization under Chapter 11 of the Bankruptcy Code. Principal assets are a phosphate mine and related port facilities in Manatee County, Florida, plants at Taft, Louisiana and Conda, Idaho and an interest in a partnership owning a phosphate mine also in Conda, Idaho. Other assets include closed plants at Marseilles, Illinois and Carlsbad, New Mexico, an office building in Greenwich, Connecti- ·cut and foreign subsidiaries doing business in Italy and Brazil. The Beker petitions and related documentation filed on October 21, 1985, assert that these assets have a value of $411,323,000.

It is similarly asserted that Beker's liabilities amount to $259,235,000. The debt structure of Beker Industries can, for our purposes here, be classified as pre and post-petition secured debt, general unsecured debt, and the face amount of $65 million due to holders of Beker's Secured Subordinated Debentures issued in 1983. The Committee asserts that the amount due is currently roughly $72 million with interest. As of the filing of the petitions, the secured debt consisted of accounts receivable and inventory financing of approximately $21.7 million provided by National Bank of Canada and Commercial Credit Business Loans, Inc., and term loans of approximately $33.4 million provided by the same entities and First National Bank of Boston. (These three entities are hereafter referred to as the "Banks".) The accounts receivable and inventory financing is secured by security interests in the Beker Industries accounts receivable and invento-

ry at Taft and Conda. The term loans are collateralized by the plants at Taft and Marseilles and by the stock of Beker Phosphate, a debtor herein. The Secured Subordinated Debentures are secured by a first lien on the plant and partnership interest at Conda and a second lien on the accounts receivable and inventory of the Conda plant. To the extent that there is a deficiency in the collateral, the debentures are subordinated to debts owed general unsecured creditors.

## A.

Prior to filing for reorganization, Beker negotiated a $5 million loan from the Banks in August 1985. The sum was apparently insufficient and Beker attempted to obtain further financing in October 1985 to no avail. After the filing date, and with the Banks intractably refusing to permit accounts receivable and inventory financing over the formula base, the Debtors sought the permission of the Court pursuant to § 363 of the Code to use $21 million of cash collateral over the Banks' objection. After an evidentiary hearing it was preliminarily permitted to use $7.6 million on October 22, 1985 with a further hearing to be held on November 8, 1985. At the November 8, 1985 hearing, Beker ultimately was permitted, on the consent of the Official Committee of Unsecured Creditors and the two debentureholders who subsequently sought appointment of a debentureholders committee, to enter into a post-petition short-term revolving loan agreement with the three Banks providing accounts receivable and inventory financing. That post-petition financing provided super-priority financing at $5 million over the lending formula of 85% against receivables and 50% against inventories, up to $24 million, and for first liens on, *inter alia*, the Taft, Marseilles and Carlsbad plants. Originally due to expire on December 31, 1985, the interim financing was extended to January 30, 1986 and several times thereafter during the pendency of the motion seeking approval of the Proposed Agreement.

As the maximum that the Banks would permit pending negotiation and approval of the Proposed Agreement, the interim financing allowed the Debtors to operate only at a low level of inventory and receivables and not at maximum efficiency (Tr. at 66). Without adequate working capital, the Debtors have been "hemorrhaging cash" (Tr. at 129) in the amount of $100,000—125,000 a day (Tr. at 132). Recognizing this, Beker's management, starting in December 1985, sought further financing from the Banks.

The testimony that these Debtors require at least $36 million in working capital to operate all its facilities under its 1986 business plan ("1986 Business Plan") (Tr. at 112, 774–6, 781) is uncontradicted. The Proposed Agreement providing for lending at this level was reached only after negotiations and discussions between the Banks and the Debtors described as "difficult" (Tr. at 86) and "long and arduous" (Tr. at 778). During these negotiations, the Debtors were asked by the Banks to prepare different plans to try to reduce levels of borrowing (Exhibit C; Tr. at 86–7) and a plan which contemplated the operation of the Taft facility only (Exhibit D; Tr. at 92). In mid-January, Beker finally prepared its 1986 Business Plan, which the Banks were willing to accept. But they still refused to loan sums to be used to maintain the Conda plant in which they did not have an interest (Tr. at 96, 779). Accordingly, Beker realized "slowly and reluctantly" that it would have to offer a mortgage on the Conda facility to the Banks (Tr. at 779–80) if it were to operate that facility. It yielded to the Banks' conditions only when it appeared that it could not persuade the Banks to accept a less advantageous position (Tr. at 126–8).

It is equally clear that there are no other lenders willing to finance these Debtors. Beker, before filing the Chapter 11 petitions, unsuccessfully approached some 35–40 lenders to obtain new or additional or replacement financing (Tr. at 164–5). The Debtors also approached approximately 20 lenders, post-petition, to seek financing using its Florida assets as collateral, again without success (Tr. at 165–6, 177, 782–3). Nor has the Committee shown that other financing could be secured (Tr. at 123–5; 787), either for Beker as a whole or for Beker's operations ex-Conda and for Conda separately. It is thus apparent that no alternative financing for its 1986 Business Plan is available to Beker.

## B.

The 1986 Business Plan upon which the Banks have committed themselves to lend pursuant to the Proposed Agreement was prepared with the assistance of Beker's management consultants (Tr. at 456) and consultants specializing in the fertilizer industry (Tr. at 715). It projects a positive cash flow from operations in 1986 in the amount of $13.4 million on the basis of Beker operating all of its facilities, with Conda operating at 48% of capacity through the first half of 1986, and returning to 100% capacity in the latter half. (Tr. at 460–1; Exhibits A, B, C, D, M). Included in that sum is the projection that the Conda facility will generate a positive cash flow of $7.5 million (Tr. at 777–8).

Beker's working capital requirements reflect the seasonal nature of the phosphate fertilizer industry (Tr. at 66). Under the 1986 Business Plan, its working capital requirements were to peak at $36 million during February-March of 1986, decrease to $23 million during May of 1986, and then rise again in August of 1986 for the planting of winter wheat (Tr. at 66–69). The Plan includes the additional $8 million the Debtors need in order to operate Conda as well as Taft, as the Debtors have declined to abandon the Conda facility, as had been suggested by the Banks (Tr. at 111).

The 1986 Business Plan is depicted by the Debtors to be conservatively estimated, because factors beyond the control of the Debtors are held constant and raw material and conversion costs are overstated. That characterization is supported by substantial evidence and we so find. For example, improvements in the marketplace for their product, and the decrease in the cost of its

supplies, were not assumed (Tr. at 776–7). More significantly, the costs of raw materials for 1986 are estimated by Beker's consultant, Dennis R. Johnson, and found by actual experience in January and February 1986, to be lower than those assumed in the Business Plan (Tr. at 1295–1303; Exhibit 4–4). The prices for Beker's finished product are predicted to remain flat or higher than those employed in the Plan (Tr. at 720), a prediction supported by the current spring prices for the super phosphoric acid manufactured by Conda. That price is $20/ton higher than the estimated price utilized in the Plan (Tr. at 157).

The 1986 Business Plan, moreover, is supported by the current state of the phosphate fertilizer industry and Beker's position in it. Owing to the depressed United States farm economy and a strong U.S. dollar, manufacturers of DAP and phosphoric acid are currently not profitable, and phosphate fertilizer production is below 40% of the total industry capacity, with several of Beker's competitors having shut down some or all of their facilities (Tr. at 168–70). This, however, appears to run in Beker's favor. Of its competitors which will be operating in 1986, Beker's Taft facility has the lowest cash cost of production (Tr. at 171) due to the proximity to a deep water port and the Mississippi River, thus resulting in lower freight costs. Similarly, its freight costs to bring sulphur from production points to Taft are less than those for some of its competition (Tr. at 174).

Undoubtedly, as the Committee argues, the 1986 Business Plan lacks certitude. Forecasting is hardly a science; nor is it a guaranty of the future. But, if done honestly and forthrightly with considerable prudence and with care to recognize the factors that can contribute to material variations, forecasts are a valuable tool in assessing the likelihood of future occurrences.

To this notion, the Committee responds that the 1986 Business Plan leaves no margin in providing the working capital needed, for decreases in prices for Beker's products, for increases in prices for raw materials and for failure to collect accounts receivable. It adds the opinion of its expert, Professor David A. Gulley of the Columbia University School of Mines, that a sensitivity analysis should accompany such a Plan and be used to test it.

It is undisputed, and Gulley's testimony shows, that material detrimental changes in the assumptions upon which the 1986 Business Plan is based would leave Beker highly vulnerable and, in some cases, unviable. But the conservative nature of Beker's assumptions, e.g., use of prices for significant raw materials exceeding those of the current market and use of a price for super phosphoric acid produced by Conda at less than the current market price, affords what appears to be a reasonable comfort margin for 1986.

Moreover, the 1986 Business Plan has credibility in that it is based on price forecasts for Beker's principal product, diammonium phosphate ("DAP"), by Johnson, whose status as a leading student and forecaster of prices and costs in this industry is unchallenged on the record. That is not to say that Johnson has always been correct; indeed, at times his forecasts have not been borne out. But the 1986 Business Plan, regardless of being contained in several documents generated for discussion with the Banks and its resulting cash flow forecast for 1986 being evidenced only by oral testimony, is hardly the self-serving creation of corporate management that the Committee apparently views it to be. Adding to its credibility, moreover, is that the Banks are willing to lend against it even to the tune of not only permitting the continued use of cash collateral but also in advancing new money, and that a new lender is willing to participate up to $6 million. It is, to be sure, as Beker's chief executive testified, "anybody's guess" as to the future in this industry. But that is always true in peering through the mist that shrouds the present from the future. Educated market projections are made and business is conducted in reliance on them.

Moreover, the concerns expressed by the Committee with respect to the collectibility

of accounts receivable enjoy no foundation on this record. Perhaps it is a general truism that account debtors are slow to pay when an industry is troubled and a member of it is undergoing reorganization. But here Beker's assumption of collecting on the bulk of its accounts receivable in 60 days, excepting the "special margin accounts" is supported by the undisputed evidence of sales to large entities that pay their bills and on letters of credit (Tr. at 1038).

Of more significance is the one month delay in the implementation of the 1986 Business Plan and that the Proposed Agreement provides for interest at 1.25% higher than the rate employed in the Plan. It does appear that the delay is significant and Beker's need for built-up inventory going into the spring planting season has not been met. But there is no evidence that the delay has been so significant as to preclude Beker from producing that inventory before missing the selling season. Absent that, it would appear to be able to recapture the sales lost from the lack of financing and the resultant inability to run Taft and Conda at the rates forecast. Similarly, there would appear to be enough positive cash flow, even if discounted by 8.5% to account for the lost month, to withstand the change in interest rate.

Nor is the commercial reasonableness of the 1986 Business Plan contradicted by a report prepared by Arthur D. Little & Co. ("ADL") for the Committee. That report could be said to indicate that the principal part of Beker's operations, mining phosphate rock at its Wingate Creek, Florida mine and manufacturing phosphate fertilizer products at its Taft, Louisiana plant, will operate at $12.7 million loss in 1986. Although the report does contain going forward projected income statements, it constitutes an evaluation of those properties on a going concern basis by estimating their joint worth to a hypothetical purchaser on the basis of several key assumptions. Among those assumptions, two stand out

in this respect: the use of industry-wide market prices for phosphate rock and the use of 1985 prices for other raw materials.

As to the first, Beker's actual phosphate rock costs, as established by Gary L. Dahms, Beker's Gulf Operations Manager, whose testimony was highly credible, reduce the charge to cost of goods sold as stated by ADL in the amount of $2.63 million. Similarly, Beker's costs for ammonia and sulphur during the first two months of 1986 reduce that charge by $9.644 million and $1.815 million respectively. These differences alone more than make up the alleged loss. Furthermore, the prices used by Dahms for ammonia in making that calculation is higher than current costs and his unrebutted testimony is that current costs may not yet reflect reduced energy costs (Tr. at 1297–1300). That is not to say that Beker will operate at a profit in 1986. Indeed, with interest charges and depreciation, it may, holding all other ADL factors constant and without regard to its Conda operations, likely operate at a loss. It is to say that Beker's projection of positive cash flow[1] is not rebutted and its ability to remain a going concern in 1986, with the proposed financing in place, is highly probable.

C.

The desirability of Beker's remaining a going concern and of its plants remaining in operation is, moreover, unchallenged on this record. Even were Beker unable to reorganize on a stand-alone basis, it is undisputed that an operating plant has more value than a closed plant in the eyes of potential purchasers. Only the degree of diminution, from 10% to 33⅓% in the first few months (Tr. at 26, 31), is disputed. Furthermore, to close and maintain plants like those at the Taft and Conda operations entails significant expense. Particularly is that so with respect to the Conda plant. Beker estimates a charge of $1.99 million to shut it down were it to now be closed, and $2.08 million to reopen it in twelve

---

1. Cash flow and income are not equivalents. Cash flow analyses, *inter alia,* exclude deprecia-

tion charges. J. Van Horne, *Financial Management and Policy,* 109, 168 (5th Ed.1980).

months (Exhibit D at 9). While Beker's investment banker estimates that Conda might be sold in six months (Tr. at 23–24), no buyers have appeared on the horizon.

The magnitude of the Conda plant, the nature of the materials used, existing contractual commitments and yield losses on reopening explain the cost. The plant contains hundreds of miles of pipe, compressors as large as a room and numerous huge tanks. Highly caustic material is run through the system; catalysts must be maintained at exceptionally high temperatures; gypsum must be cleaned out; contaminated water must be pumped from one pond to another to avoid discharge; skilled employees must be retained. Most significantly, with the plant closed, it would incur a rock usage penalty of $1,538,000, calculated at $3.07 a ton (Exhibit D at 6), payable to the partnership that supplies rock for the plants. Although the applicable agreement contemplates negotiations, that rate has a historical basis derived from a penalty that was charged to Beker's partner for failing to take a minimum contractual amount in 1982 and is therefore reasonable. Yield losses of at least $1 million would also be encountered (*Id.* at 9).

To the Committee's expert, Walter R. Benson, of the Stanford Research Institute, these sums are highly excessive and "wild guesses." (Tr. at 689). Indeed, the table that itemizes them is entitled "Guesstimated Cash Cost of Alternative Shutdown Scenarios" and was prepared in one day (Tr. at 363). But the author, Gary D. Greer, Beker's chief operations officer, ran the Conda plant for 11 years and demonstrated in his testimony a great familiarity with its operations and the specific tasks to be performed were it to be shut down and the costs and penalties to be incurred. His demeanor, his explanation of even the most minute tasks and his willingness to admit an error on his table gave great credibility to his testimony. For example, the charge for yield losses appeared to be exaggerated until he explained that Beker reports its recovery yield percentages daily and took several years to increase those percentages to their present level of 98% (Tr. at 821–4).

Furthermore, the $4 million cost of shutting the plant down and reopening it after a year, has its own historical basis. While the Committee challenged the $3.3 million cost asserted by Beker in reopening the Conda plant in 1971–2 after acquiring it from El Paso Natural Gas Corp. in 1968, Greer's testimony of a cost of $5–6 million incurred in mothballing the plant in 1976 and reopening it three months later when he was in charge of it, was unchallenged and unrebutted (Tr. at 313–4).

### D.

Raw estimates of a going concern value of the Conda plant range from $60 to $100 million. None is particularized. Similarly unvarnished were the ADL estimates of liquidation value for the Taft operation ($10,027,200), the Wingate Creek Mine ($4,629,300) and the Marseilles plant ($4,027,500) (Exhibit 47). No values were given for Beker's Greenwich, Connecticut building or its Carlsbad, New Mexico plant. ADL did provide an estimated going concern value for the Marseilles plant at $2.1 million (Exhibit 46). That estimate was supported in reasonable detail and was not contested by Beker.

Rather, the parties concentrated their attention on the going concern value of the Taft operations and the Florida mine as an economic unit and it is to that topic that we now turn.

### E.

Beker obtained a development of regional impact order ("DRI") under applicable Florida law in 1975 to operate its Wingate Creek mine in Manatee County, Florida for 30 years at the rate of 3 million tons per year. The mine is located on some 10,700 acres. As of 1980, it had reserves of 78.4 million short dry tons consisting of 61.8 million proven-probable reserves, 10.8 million unclassified reserves and 5.8 million inferred reserves (Exhibit 46 at II–2, II–3). According to Dahms, proven-probable reserves today amount to 57.7 million short dry tons (Tr. at 1277). According to ADL,

proven-probable reserves as of the end of 1985 at 57.2 short dry tons are to be discounted by 6 million tons to account for variances between actual recovery rates and inability to mine sensitive wetlands areas (Exhibit 46 at II–4, II–6). It places no value on the reserves. Dahms disputes the inability to mine the wetlands areas, noting that Beker replaces wetlands under the DRI (Tr. at 1279). Conservatively assuming, *arguendo*, the accuracy of the ADL estimate as opposed to Dahms' estimate, the following value of proven-probable reserves as of 1995 can be calculated with value attributed at $2.50/ton as forecast by Johnson:

| Operating Rate/Year | 12/31/95 Reserves on basis of 12/31/85 Reserves of 57.2 Million | Value (000's) | 12/31/95 Reserves on basis of 12/31/85 Reserves of 51.2 Million | Value (000's) |
| --- | --- | --- | --- | --- |
| 1.5 million | 42.2 | $105.5 | 36.2 | $90.5 |
| 1.7 million | 40.2 | $100.5 | 34.2 | $85.5 |

Phosphate rock is mined by Beker through a dredging process that first strips overburden. Recovered rock is processed through a beneficiation system and then shipped by truck to Port Manatee. There it is loaded on a barge and transported to Taft, Louisiana for processing.

Operation of the mine and shipment of rock is subject to significant regulation under Florida law. That regulation raises two principal concerns: reclamation of mined land and trucking of rock. ADL asserts that Florida regulators are concerned that reclamation has not proceeded to the degree anticipated by the DRI and asserts a cost of $2.4 million. Dahms' unrebutted testimony is, however, that the mining has not proceeded at the 3.0 million tons per year level permitted, that reclamation of acreage actually mined has taken place and that the cost of further reclamation has been booked (Tr. at 1281–6). Thus, ADL's concern for reclamation liabilities of $2.4 million is overstated. Similarly ADL's claim that $200,000 would be incurred over two years to remove an overburden pile and a tailings pile is dubious. It is also unrebutted that half is allowed by permit and the cost of removal of the other half over the remaining 20 years of the permit is also accrued as part of rock costs (Tr. at 1286–8).

More significant and troublesome is Beker's ability to ship rock from the mine. The regulatory constraints on this ability, the confused nature of Beker's permit applications in this regard and the current status of its litigation with Manatee County and the State of Florida are set forth in our decision and order of February 6, 1986. *See In re Beker Industries Corp., et al.,* 57 B.R. 611, 616–17, (Bankr.S.D.N.Y.1986). Familiarity with that decision is assumed. For present purposes, it need only be recounted that a Hearing Officer has approved Beker's application to ship 1.2 tons annually, and that pending resolution of appeals from a final decision by the Florida Land and Water Adjudicatory Commission with respect to the Hearing Officer's report, two injunctions have been entered by the Florida state court permitting Beker to ship 1.5 million and 2.0 million tons per year. No appeal was taken by Manatee County or anyone else from the former. Since it is agreed that the appeals will be lengthy, Beker's ability to ship at 1.5 million tons annually will be undisturbed for 2–3 years and it will thus be able to operate at current levels. The reluctance by Manatee County to appeal the 1.5 million injunction, when coupled with the findings of the Hearing Officer, moreover, strongly indicates that, were Beker to file an application to ship at that level, it would likely be ultimately approved.

That conclusion and the further conclusion that the DRI will be extended and Beker permitted to operate the mine past

the expiration of the DRI in 2005 are particularly fortified by the Hearing Officer's finding that the mine has a favorable economic impact on Manatee County and the State of Florida (Exhibit U at 23). It employs 148 people at an annual payroll of $4.5 million, pays roughly $5 million in severance, sales and property taxes and purchases $22 million in goods per year from Florida based vendors (*Id.* at 10). ADL's concern on this score is overstated. Indeed, it makes no mention of Beker's heavy economic contribution and its report (Exhibit 46 at II–12) erroneously describes the exact status of the current regulatory proceeding in Florida.

### F.

The other half of this economic unit, the Beker operation at Taft, Louisiana, constitutes a wet process phosphoric acid and DAP facility located on the Mississippi River. These products are made from phosphate rock from the Wingate Creek mine, sulphur, sulphuric acid and ammonia. A di-hydrate process is currently employed. A hemi-hydrate process requiring further capital expenditure of $1.7 million has been partially installed and is to be completed in early 1986. It will produce considerable savings (Exhibit 46 at II–24; Exhibit D at 11).

Initially established in 1964 and purchased by Beker in 1971, the Taft facility has been repeatedly modified and upgraded, thereby expanding production capacity. It is not disputed that "Beker's Taft plant is presently among the lowest cost producers in the U.S., and appears to have the lowest cost DAP on a delivered basis to the region west of the Mississippi River stretching from Louisiana to Iowa and west to Oklahoma and Nebraska." (Exhibit T at 9–10).

As is the case with nearly all chemical plants, the Taft plants carry with them environmental concerns. According to ADL, the two principal concerns lie in the disposal of gypsum and emissions to the atmosphere by one of Beker's two sulphuric acid plants. With respect to Beker's discharge of gypsum, a non-toxic by-product, into the Mississippi River, ADL states that the Environmental Protection Agency has drafted an apparently uniform permit for four phosphate plants located on the lower Mississippi that would regulate discharge times and levels. The draft permit is not part of the record before us. It is further averred that additional limitations on fluorides, phosphorus and selected metals "will probably be established." (Exhibit 46 at II–27). Contrary to its statement that maximum discharge levels would be established for gypsum, ADL presumes that Beker would have to cease all discharge into the Mississippi River. It then attempts to calculate the cost of land discharge of gypsum and pegs a land acquisition cost of $5 million (*Id.* at II–28).

This speculative chain of reasoning takes no account for even the middle ground of partial discharge into the Mississippi River. We similarly are unable to give significant weight to concern for the sulphuric acid plant, for the ADL report is worded in such a fashion so that we cannot determine whether Beker will continue to use it upon conversion to the hemi-hydrate process. The ADL report states that, with conversion, the "No. 1 sulphuric acid plant" will be shut down (*Id.* at II–21). That term is not defined and it is unclear which of the two Taft sulphuric acid plants it refers to. At oral argument, Beker's counsel asserted that it referred to the same plant identified as raising the environmental concern. Counsel to the Committee did not agree or disagree with the assertion.

### G.

"[T]he discounted cash flow method of valuing businesses is a widely used technique." (Exhibit 46 at II–31). While ADL observes that the use of that method "presents significant difficulties in a business such as [Taft]," because of cost and price variations, *ibid.*, it employs that method and adjusts for the volatility by constructing a ten year bust to boom to bust cycle of margin ratios. The first 10 months of 1985 were selected as the low

end and costs of raw materials are fixed at prices experienced in that period. On that basis, ADL estimated after-tax going concern values in 1995 for Taft-Wingate at $28,003,000 using a 25% discount factor and at $37,223,000 using a 20% discount factor (*Id.* at II–57). Employing the same method but forecasting rising forecasted prices and somewhat different underlying assumptions, Johnson estimates the following pre-tax values for Taft and Wingate together:

| Discount Factor | Estimated Values (000's) | |
| --- | --- | --- |
| | 1995 | 2000 |
| 10% | 115 | 186 |
| 15% | 97 | 137 |
| 20% | 84 | 107 |

(Exhibit T at 31).

Among the differing assumptions employed, Johnson selects the pre-tax values at a 15% discount factor as most appropriate, reasoning that a hypothetical purchaser would seek and be attracted by such a pre-tax return. ADL computes its estimates on a post-tax basis and asserts that a more appropriate methodology should be based on a historic average risk premium received by investors in Fortune 500 companies, identified as 9.0% over the yield in Treasury Bills, and the results of studies said to show that investors in smaller companies require an additional return of 2%–4%. Using a Treasury Bill yield of 7.1% and a small company increment of 3%, ADL thus computes a base discount rate of 19%. It then claims that an investor would require an additional 6% risk premium due to "the very substantial environmental risks associated with this business," (Exhibit 46 at II–54), and due to the notion that a prospective purchaser would require an additional discount in light of the ADL cash flow projections that estimate no positive cash flow in the early years *(Ibid).*

Other differing assumptions abound. ADL claims that a purchaser would be concerned over the continued ability to truck ore from the Wingate Creek mine at appropriate levels, would construct a railroad costing $20 million and make other acquisitions, including a new dredge (Exhibit 46 at II–10, II–12). It is further assumed that it would obtain a $10 million working capital loan and repay both that loan and the loan for the railroad in 1989 ($23,432,000) and 1990 ($17,517,000) (*Id.* at II–51). Johnson assumes that a railroad would not be required and capital investments of $2 million in 1986 (hemihydrate process) and $3 million for each of the years 1987–92, rising to $4 million/year to 1997 (Exhibit T at 31).

This difference has a marked effect. As ADL states, "[a] discounted cash flow analysis puts great emphasis on early years results and de-emphasizes future earnings." (Exhibit 46 at II–35). Most significantly, it is all too apparent that a railroad cannot be built. As found in our decision of February 6, 1986, the owners of land between the mine and Port Manatee have refused to grant rights-of-way. Dropping that proposed expenditure has been calculated by ADL to raise their estimate of going concern value for Taft-Wingate to $34.144 million at a 25% discount rate. Applying the same 17% differential to the 20% discount rate estimate of $37.223 million yields an estimated value at that rate of $44.8 million.

Secondly, it is plainly inappropriate to posit an estimate upon the notion that a purchaser would expect to repay working capital financing in four or five years and operate without such financing thereafter. Rather, repayments should be spread out. No one has made the calculation but application of the percentages employed by ADL in employing its 25% cash flow to a level payment and continued interest scenario would seemingly raise the estimate by $1.7 to 2.0 million with a somewhat lesser effect on the estimated value at a 20% discount rate.

In addition, the use of 1986 prices, as indicated *supra,* and current conversion costs would change ADL's estimate of negative operating cash flow of $5.8 million for 1986 by some $14 million thereby giving a positive operating cash flow for 1986 of $8.2 million. In light of projected new bor-

rowings of $18.8 million by the hypothetical purchaser, the change would produce a net cash flow of $14 million. Application of the 25% discount rate percentage used by ADL for 1986 would add $11.2 million to the ADL cummulative cash flow estimate for 1986 at that rate and approximately the same amount to the estimate at a 20% rate.[2]

Other key differences lie in ADL's refusal to credit any residual value of the Wingate Creek mine after 1995 due to environmental fears and differing perceptions of the status of Florida phosphate reserves. ADL is concerned that a new buyer might have difficulty obtaining a DRI due to hostility by Manatee County, but fails to mention the significant economic benefits found by the Florida Hearing Officer or to address Johnson's findings that supply will tighten in Florida due to depletion of other reserves and lack of expansive growth of world reserves.

## II.

Section 364(d)(1) of the Bankruptcy Code permits the Court to authorize a debtor-in-possession to obtain credit secured by a lien senior or equal to a lien on property of the estate if such credit cannot be otherwise obtained and "there is adequate protection of the interest of the holders of the lien on the property of the estate on which such senior lien is to be granted." 11 U.S.C. § 364(d)(1).

■ Here it is patently clear that the credit sought to be obtained is not otherwise available. The repeated attempts to find other lenders, the intractability of the Banks and Beker's having to litigate with them to obtain the use of cash collateral, the onerous negotiations and the Banks' unwavering insistence on a lien on the Conda facility if loan proceeds were to be utilized to operate or maintain it all amply demonstrate the unavailability of the credit sought except upon priming the Debentureholders' lien.

We thus turn to whether the adequate protection is afforded to the Debentureholders. In offering adequate protection, the Debtors assert it is to be found in two distinct but cumulative ways: preservation of the going concern value of the Conda plant and in the value calculated on a going concern basis of second liens that it offers on its Taft, Wingate and Marseilles facilities aggregating the lesser of $10 million and the proceeds realized from disposition or liquidation of the Conda plant or partnership paid to the Banks and new lender under the Proposed Agreement. A similar but third lien on the Greenwich office building and a *pari-passu* lien on the Carlsbad plant are also offered but no evidence of the value of those facilities has been proffered. The liens are non-voting to the extent that until the amounts owed by Beker to the Banks and new lender are paid, the holders thereof may not foreclose.

## A.

■ The concept of "adequate protection" is not defined in the Code except by the implications of the examples of adequate protection listed in § 361. 2 *Collier on Bankruptcy* § 361.01 (15th Ed.1984). Its application is left to the vagaries of each case, *In re Alyucan Interstate Corp.,* 12 B.R. 803, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bankr.D.Utah 1981), but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process. *E.g., In re Saypol,* 31 B.R. 796, 799–802 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 828, 8 B.C.D. 1406, 6 C.B.C.2d 713 (Bankr.S.D.N.Y.1982).

■ Emphasizing that basic element of detriment, the Debtors assert that none will occur here since the Conda plant will be kept open and thereby not suffer the undisputed loss of value that it would incur if it were closed. But on this record, the emphemeral nature of that concept is all

**2.** At a 25% discount rate, ADL employs a ratio of .8 of cash flow for the first year, 1986. At a 20% discount rate, the applicable percentage

is .83333. J. Van Horne, *Financial Management and Policy,* 789.

too apparent. The Proposed Agreement does not take the Debtors through confirmation of a plan of reorganization. By its terms, it terminates on confirmation. The Proposed Agreement thus does not provide the basis upon which to confirm a plan. Indeed, unless confirmation first occurs, it terminates on January 31, 1987. There is nothing on this record that indicates whether the Banks, were the loan to be continued, or their replacements, will continue to loan against Conda or provide only for Beker's other operations. Nor is there any indication that the Conda plant and partnership interest can be sold within a year.

All that can be said is that Proposed Agreement would postpone the decision of whether to close the Conda plant and would spare the Debentureholders the expense of funding today the amount to close down Conda now and maintaining it for a year in a closed condition. On the basis of Greer's estimate of $15.72 million to shut the Conda plant down and maintain it for one year and applying an interest rate of 11%, we find that lack of detriment to be $1.73 million.

Here, there is no question that the imposition of a $10 million senior lien on the Conda plant in favor of the Banks is a detriment to the Debentureholders' interest in that collateral. Since there is no evidence that Conda, on a liquidation or going concern basis, has a value of less than $10 million, the harm is measured by that sum less the lack of detriment in the $1.73 million of interest saved by delay in closing the plant. Thus, the issue here involves not the need for adequate protection but the amount of its alleged provision.

### B.

To the Committee, only the liquidation value of the Taft, Wingate and Marseilles facilities can be considered. It further asserts that it was the Debtors' burden of proof to show liquidation value. These positions are without merit.

■ As to the burden of proof issue, § 364(d)(2) states only that a debtor-in-possession "has the burden of proof on the issue of adequate protection." It makes no requirement that it prove up all different valuation scenarios. All that is contemplated is that it prove sufficient value under an appropriate standard; those asserting a different theory have the opportunity to cross-examine and impeach the testimony and the further opportunity to put on their own case and thereby show a different value. *Cf.* C. Booth, *The Cramdown on Secured Creditors,* 60 Am.Bankr.L.J. 69, 101–102 (1986).

Perhaps the Committee's reason for taking this implausible tack lies in the recognition that the evidence of liquidation value for the Taft and Wingate Creek facilities is woefully deficient. It constitutes mere numbers asserting, for example with respect to Taft, "machinery and equipment $5,241,000" and with respect to Wingate Creek "land $3,300,000." (Exhibit 47). No comparable values are given; no itemization is furnished. In fact, it is painfully apparent that these values are the product of only a "walkthrough" of the facilities (Exhibit 46 at I–1). The evidence of liquidation value is thus not only not entitled to any weight, it is hardly evidence at all. Like the other unvarnished and unsupported estimates given in this case, *e.g.,* raw valuations of the Conda plant, we give no weight to these numbers. They enjoy no credibility.

■ Furthermore, while the bankruptcy court has considerable discretion in determining the appropriate method of valuation, *see e.g., In re Kennedy Mortgage Co.,* 23 B.R. 466, 470, 9 B.C.D. 805 (Bankr.D.N. J.1982), sister courts in this Circuit hold that "the appropriate method of valuation to gauge whether the objecting party is adequately protected in a reorganization case is 'going concern' or fair market value." *In re Automatic Voting Machine Corp.,* 26 B.R. 970, 972 (Bankr.W.D.N.Y. 1983) (citations omitted); *accord Matter of QPL Components, Inc.,* 20 B.R. 342 (Bankr.E.D.N.Y.1982). Congress rejected the proposal of the Commission on the Bankruptcy Laws of the United States that

adequate protection be measured solely by liquidation value. C. Fortgang and T. Mayer, *Valuation in Bankruptcy*, 32 U.C.L.A. L.Rev. 1061, 1068 (1985). Instead, it left the matter open to case development, stating that "[n]either is it to be expected that the courts will construe the term value to mean, in every case, forced sale value or full going concern value." S.Rep. No. 989, 95th Cong., 2d Sess. 54 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5840.

To be sure, Congress also stated that, "[i]n any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case" *(Ibid.)*. But that language clearly refers to automatic stay litigation where the court is to determine whether the debtor will be able to retain use of collateral in a going concern or a secured creditor should be permitted to foreclose on the basis of liquidation value, and usually the absence of equity, and have the opportunity to achieve realization of going concern value.

The Committee has not sought such relief here. Even under equitable considerations, as applied by the court in *In re Phoenix Steel Corp.*, 39 B.R. 218, 11 B.C.D. 1153 (D.Del.1984) upon which the Committee almost exclusively relies, the equities lie heavily with the Debtors. In *Phoenix Steel*, the debtor sought approval of a loan which, as here, would be secured by liens priming the liens of secured creditors. Adequate protection was advanced on two theories: the existence of an equity cushion in the collateral and the offer of additional security. With respect to the equity cushion claim, the court valued collateral at the mean between the liquidation and going concern values proven by the parties. It did so because of the "speculative projections entangling this case" and the possibility of impairment of the value of the collateral if the projections were not achieved, or, a buyer not found to acquire the business and the debtor consequently liquidated. 39 B.R. at 226.

■ Here, not even the Committee contends that liquidation is in the offing for these Debtors. It claims that Beker has shown a remarkable ability to rise again and again "from the ashes." Beker, moreover, does not project its ability to survive upon the finding of a white knight, and its 1986 Business Plan is conservatively based on costs less than it presently incurs and which costs according to the undisputed evidence are decreasing in the near term. While the Committee has a point in its argument that the 1986 Business Plan would enjoy more credibility if it were presented in a formal unified document and that its impact on cash flow should be set forth in such a document rather then in testimony as was done here, all that the law requires is proof by a preponderance of the credible evidence. We find credible both the documentation and the testimony of Beker's consultant, Nightingale & Associates, with regard to the Plan and also Dahm's testimony as to decreasing costs of raw materials in 1986. We thus conclude that liquidation of Beker, if the Proposed Agreement is approved, is not at all likely in 1986.

■ As to the years 1987 through 1990 during which a plan is likely to be presented for confirmation, there might be concern for the historic volatility of the costs of raw materials and the prices for Beker's products. But ADL estimates that Beker's margins for its Taft-Wingate operations will, after remaining flat for 1986, steadily improve to 1991 (Exhibit T at II–50). Were the cycle reversed and it were shown that Beker's margins would be narrowing in the same period, the prospects for reorganization would be less sanguine. But the estimated betterment of margins under the ADL scenario is evidence that Beker on this record will remain a going concern with time to reorganize as the Code contemplates. Use of going concern value for

those facilities still open is thus appropriate.[3]

### C.

Defining going concern value is hardly elementary. It involves consideration of what Shelley in "A Defense of Poetry" called "the gigantic shadows which futurity casts upon the present." Those who would prepare future cash flow analyses and discount them to present value to arrive at a present going concern values are not oracles. The opinion evidence they present regarding a hypothetical willing buyer's perception of a business should be taken as a set of assumptions that are factored into a model and critical analysis then employed to test those assumptions. The evidence in this exercise is hardly clear, is highly judgmental and consists largely of inferences. The tool is not to be discarded for these reasons. But use of the tool requires recognition that its worth in identifying the price to be paid by a hypothetical buyer is not merely a mathematical exercise but most of all an identification, testing and weighing of assumptions within a methodology.

As to the methodology, the parties differ in principle with regard to the propriety of pre-tax forecasts. Beker's thesis that the hypothetical purchaser brings to the assumed transaction his own tax structure has plausibility. But, the

> problem is that an earnings estimate for a future period usually is predicated upon reinvesting a portion of earnings from previous periods. To use [pre-tax] expected earnings in evaluating an acquisition results in double counting....

J. Van Horne, *Financial Management and Policy* at 168 (footnotes omitted). Upon valuing post-tax cash flow, further assumptions can then be made regarding the types of purchasers who might be interested in the transaction.

The Johnson estimate is thus flawed in this respect and its evaluation, as opposed to some of the assumptions underlying it, is difficult to credit. The ADL estimate, which does consider taxation, is also flawed. It heavily devalues the strengths that the most likely hypothetical purchaser would have by imposing an additional 6% risk factor in part because of its view that cash flow would not be generated in early years. At the hearing John L. Sherff of ADL, who was in charge of its evaluation team, testified that the most likely purchaser would be a diversified company like those who own and operate Beker's domestic competitors. Such a company, by virtue of its diversified nature, has the ability to withstand early years of low cash flow. Other facets of the transaction, such as obtaining market entry and production capability will likely assume greater significance. Indeed, Cargill, Inc., a large diversified entity, recently obtained a competitor of Beker and then closed it down, thereby negating any immediate prospect of early cash flow return (Tr. at 170–1).

That additional 6% risk factor is also flawed because of ADL's undue emphasis on the environmental regulatory issues regarding the Wingate Creek mine. The regulatory prospects of the mine may justify expectations that its productions and shipping of phosphate rock may be limited perhaps to 1.5 million tons per year and perhaps a small limitation on acreage. But they do not, particularly in light of the local economic benefits that Beker's Florida operations contribute and in light of ADL's projection that the mine will produce 1.63 million tons per year from 1986 to 1995, justify a total discount. Nor do they justify ADL's failure to attribute residual value to the proven probable reserves at the

---

**3.** The Committee further contends that the non-voting nature of the replacement liens compels use of liquidation value. How this is so is not explained except by the statement that the Debentureholders would not control any liquidation by the Banks and new lender. As holder of first liens, the banks and new lender would, however, as the Debentureholders assert, be compelled to liquidate in a commercially reasonable manner, which on this record would appear to be to run the mine and plants and sell them as going concerns. Furthermore, with the case in reorganization and with the market, under the ADL scenario apparently affording the time to reorganize, it appears unlikely that foreclosure will be in the offing.

mine. Indeed, those reserves may increase in value due to the predicted depletion of other reserves in Florida. A 20% rate is far more appropriate than a 25% rate and a proven-probable reserves value of at least $60 million in 1995 should be recognized. Such a value is likely overly cautious and understated in that it reflects a discount of $25 million from the ADL calculation of current reserves at 51.2 million tons mined at 1.7 million tons annually. That discount is more than sufficient to account for a reasonable allocation between the two reasons offered by ADL for imposing the 6% special risk premium. Assuming Johnson's price of $2.50/ton for reserves is in 1995 dollars, the $60 million reserve value should be discounted at the 20% discount rate to $9.7 million.

Other adjustments that are plainly apparent add marked value. Among them is elimination of a new settling pond dredge for the Wingate Creek mine that ADL states is required. Beker has had its current dredge for only a year and maintains it constantly (Tr. at 1275–76). Environmental concerns for emissions by the sulfuric acid plant at Taft are similarly not of any proven magnitude given the equivocal nature of ADL's discussion of the subject, as noted above. The concern for discharge of gypsum at Taft is to be discounted to reflect the likelihood that at least partial discharge is to be permitted in the future.

Similar, and more substantial, adjustments to the ADL estimate of going concern value must be made to reflect the lower costs of raw materials that are currently being incurred. In the exercise of prudence, those adjustments should be made for 1986. At a 20% discount rate they, after discounting them for the delay due to the litigation of this motion, would add some $9.5 million to the ADL estimate. On the basis of prudent assessment of all the evidence, we find that the Taft-Wingate facilities taken together have a going concern value in the range of $60–$65 million.[4]

With respect to the Marseilles facility, application of going concern value is more questionable since several of its operations have been closed for over ten years. Beker's dicalcium phosphate/diammonium phosphate plant and its sulphuric acid plants at Marseilles were closed in 1985, and according to ADL would cost a minimum to reopen. But because the closing of a plant is conceded to reduce its going concern value and it is not clear that ADL considered that impact, we find a going value of $1.5 million for those plants. Liquidation values for the remaining facilities at Marseilles are not found due to the lack of credible evidence of liquidation value on this record and due to the failure to have maintained those facilities.

## D.

■ In calculating whether the Debentureholders will be adequately protected, the Committee asserts that as of March 31, 1986, principal and accrued interest on the Banks' loans would equal $40.4 million and the revolving credit loan would amount to $36 million is provided in the 1986 Business Plan, thus resulting in a total debt of $76.4 million. Against this sum, the Committee contends such borrowing base accounts receivable (85%) and inventory (50%) amounting to $24 million and the proposed first lien on Conda are to be netted leaving a remaining indebtedness of $42.4 million. According to them, the Debtors' inventory accounts receivable having a value of $9.6 million above the Banks' formula for lending should not be considered even though the special margin accounts are not included. On that basis, the Committee asserts that the Taft, Wingate and Marseilles facilities must be found in the amount of $52.4 million to adequately protect the priming of the Debentureholders lien on Conda by $10 million. Under their formula, it is accordingly apparent that adequate protection has been afforded to the Debentureholders.

---

4. A discount must be taken to account for the first lien on the Wingate Creek mine granted by this Court to Cargill, Inc., in the amount of $1.2 million. That sum is *de minimus* in light of the range of values we have found.

Indeed, it is apparent that there is an excess above that identified above. The Committee's formula fails to account for the $1.73 million of interest that is saved by avoiding shutdown of Conda today and further fails to account for the undisputed testimony that Beker's inventory and eligible accounts receivable have a value in excess of the base on which the Banks lend. That value, given the testimony of collection exceeding 95% of eligible accounts receivable and the ability to sell off inventory at market, well exceeds 90% of book value.

■ It is no answer that the Banks do not lend up to the full amount. Banks rarely, if ever, do. Adequate protection, not absolute protection, is the statutory standard. *Cf. In re Natco Industries, Inc.*, 54 B.R. 436, 440 (Bankr.S.D.N.Y. 1985). Beker's accounts receivable and inventory, particularly the inventory, will serve to reduce the $54.2 million base asserted by the Committee. Together with the saving in interest noted above, the excess accounts receivable and inventory provide the Debentureholders with an additional measure of comfort from the necessary uncertainty that estimates of the future entail.

## III.

With it being apparent that § 364(d)(1) has been satisfied through the provision, pursuant to § 361(2), of replacement liens that account for the decrease in the value of the Debentureholders interest in the Conda facilities due to the priming of their liens, we now turn to the further objections set forth in the Committee's brief: (i) that the proceeds of the loan called for in the Proposed Agreement will be used to benefit facilities other than the Conda facilities, and (ii) that $10 million of the Debentureholders collateral will be part of the package of collateral securing both the loan and Beker's pre-petition indebtedness to the Banks.

### A.

■ As to the first of these contentions, neither the language of § 364(d) nor that of § 361 requires that the proceeds of a post-petition loan secured by a lien senior to that held by another creditor be employed to benefit the collateral where the creditor is given a replacement lien on other property. Nor has any legislative history articulating such a requirement been called to our attention.

We can envision circumstances where a replacement lien would be offered on property whose value is decreasing due to lack of maintenance or market conditions. But future decreasing value, if any, is to be factored into consideration of whether the replacement lien adequately protects the secured creditor and is thus accounted for. In fact, that was done here, both in the focusing on the regulatory constraints on the Taft and Wingate Creek facilities and, most directly, in our holding that no value was to be attributed to the plants at Marseilles that have been closed for 10 years or so and not maintained.

In addition, it is plainly apparent here that the loan does benefit the Conda facilities not just in the tangible savings of interest amounting to $1.73 million but also in less tangible ways of enabling Beker to keep the plant running and maintained. Its 1986 Business Plan calls for such and there is nothing in this record that suggests that Beker will not do so.

### B.

As posited by the Committee, the second of these considerations involves the unfairness to creditors that arises from a secured lender's attempt, upon agreeing to extend credit post-petition that is secured by post-petition assets, to have its pre-petition loan also be secured by those assets.

Such forward cross-collateralization is not expressly permitted by the Code. J. Bohm, *The Legal Justification for the Proper Use of Cross-Collateralization Clauses in Chapter 11 Bankruptcy Cases*, 59 Am.Bankr.L.J. 289, 291 (1985). It has been held that forward cross-collateraliza-

tion is precluded by the terms of § 364(d) in the clause stating that the post-petition loan may be secured by property of the estate. *In re Monach Circuit Industries Inc.*, 41 B.R. 859, 862 (Bankr.E.D.Pa.1984). But the Bankruptcy Code was enacted against the backdrop of the former Bankruptcy Act and the least one could expect is that an intention by Congress to change prior law in enacting the Code would be expressed or clearly inferred. *Midlantic National Bank N.A. v. New Jersey Department of Environmental Protection,* — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (January 27, 1986); *In re Beker Industries Corp. et al., supra,* at 623–24.

■ Under the former Bankruptcy Act, the leading case on cross-collateralization was *Otte v. Manufacturers Hanover Commercial Credit Corp. (In re Texlon Corporation),* 596 F.2d 1092 (2d Cir.1979). There the court observed that forward cross-collateralization sharply affects unsecured creditors in that it would "work an unequal distribution of the bankruptcy property," quoting from *Tiffany v. Boatman's Institution,* 18 Wall (8 U.S.) 375, 388, 21 L.Ed. 868 (1873) and thereby permit different treatment for pre-petition debts of the same class...." 596 F.2d at 1097.[5] Since an order permitting cross-collateralization had been obtained *ex parte,* the court held that it was impermissible, stating:

> In order to decide this case we are not obliged, however, to say that under no conceivable circumstances could 'cross-collateralization' be authorized. Here it suffices to hold that ... a financing scheme so contrary to the spirit of the Bankruptcy Act should not have been granted by an *ex parte* order, where the bankruptcy court relies solely on representations by a debtor in possession that credit essential to the maintenance of operations is not otherwise obtainable. The debtor in possession is hardly neu-

tral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage. A hearing might determine that other sources of financing are available; that other creditors would like to share in the financing if similarly favorable terms are accorded them; or that the creditors do not want the business continued at the price of preferring a particular lender.

596 F.2d at 1098–99.

The notice and hearing required by § 364(d) satisfies the actual holding of *Texlon.* Forward cross-collateralization has thus been permitted where, *inter alia,* there was no objection by unsecured creditors apparently because they agreed that the lender's pre-petition loan was fully secured by a perfected security interest. *See In re Vanguard Diversified, Inc.,* 31 B.R. 364 (Bankr.E.D.N.Y.1983). In these instances, the view of unsecured creditors is of paramount importance for it is they who are able to contest whether other financing is available and it is they, the victims of the unequal treatment criticized in *Texlon,* who are able to determine if they, in the *Texlon* court's words, "want the business continued at the price of preferring a particular lender." 596 F.2d at 1099; *cf. Reading v. Brown,* 391 U.S. 471, 478, 88 S.Ct. 1759, 1763, 20 L.Ed.2d 751, 756 (1968).

■ Here, the Official Committee of Unsecured Creditors has consented to the provision apparently because of the absence of alternative financing and their desire that Beker be able to operate at the levels set forth in its 1986 Business Plan. There is nothing in this record indicating that the Banks' pre-petition debt was not validly perfected or under secured.

---

5. A cross-collateralization clause securing post-petition debt with pre-petition assets does not raise these concerns. Such a clause has been viewed as less objectionable than the forward cross-collateralization at issue in *Texlon* because the lender is "merely exacting as security for

future advances a lien or interest in what may well be the only tangible assets the debtor can offer," rather than elevating the status of his pre-petition claim. *In re Antico Manufacturing Co., Inc.,* 31 B.R. 103, 105 (Bankr.E.D.N.Y.1983).

Moreover, the Debentureholders are not affected by the cross-collateralization provision at issue here. The price referred to by the *Texlon* court, assuming that the Banks' pre-petition debt is unsecured in part or in whole, is not being paid by them. If the collateral they now enjoy is insufficient to cover their claims, the unsecured excess is subordinated to unsecured claims. Any unsecured pre-petition claims belonging to the Banks would thus stand senior to those of the Debentureholders regardless of cross-collateralization.

IV.

Other issues raised by the Committee have been considered and we find them to be without merit. Objections by the Official Committee of Unsecured Creditors and by the Official Committee of Equityholders we understand to have been resolved. Most particularly, it appears that all the Banks and the new lenders consent to revision of the Proposed Agreement to provide funds to pay professional fees and expenses, notwithstanding the super priority and liens called for therein. We interpret the statement by counsel for the National Bank of Canada and Commercial Credit Business Loans, Inc. at oral argument to mean that for currently incurred, but not yet awarded, expenses and fees of the various committees in this case and professionals engaged by them, are, if this Court awards such fees and expenses pursuant to § 330 or § 331 of the Code, to be paid from the $330,000 currently held by the Debtors in escrow. Payment of the excess and allowed future fees and expenses of such committees and counsel and the Debtors' professionals are to be paid up to $3.2 million. It has been further represented and agreed that the loans called for by the Proposed Agreement will not terminate, nor will the Debtors be in default, if relief is ever granted under § 1104 of the Bankruptcy Code.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. On the under-standings set forth immediately above, the Debtors' motion is granted.

IT IS SO ORDERED.